UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL REARDON and
SANDRA REARDON,

        Plaintiffs,

                                  Case Number 11-10116-BC
v.                                     Honorable Thomas L. Ludington

MIDLAND COMMUNITY SCHOOLS,
LAURIE STEVENS, and KURT FAUST,

        Defendants.
_____ /

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DISMISSING PLAINTIFFS' CONSTITUTIONAL CLAIMS WITH PREJUDICE, AND DISMISSING PLAINTIFFS' STATE LAW CLAIM WITHOUT PREJUDICE

Plaintiffs Michael Reardon and Sandra Reardon have a daughter, S., who at all relevant times was a student at Dow High School which, in turn, is a part of Defendant Midland Public Schools. On May 8, 2010, S.'s seventeenth birthday, she walked out of her parents' home, got into her boyfriend's waiting car, and drove away. To her parents' regret, S. has never returned to her parents' home. Defendant Kurt Faust was a guidance counselor at Dow High School and Defendant Laurie Stevens is a former teacher and media specialist at the high school. While Plaintiffs, like most parents, appreciate teachers and counselors taking an active and supportive interest in their students, the complaint outlines a series of events by Defendants that Plaintiffs assert exceed Defendants' employment responsibilities and unconstitutionally interfered with Plaintiffs' relationship with their daughter. More specifically, they allege that "Stevens and Faust conspired with [S.] and possibly others to coordinate [S.'s] leaving the Reardons' home, without the Reardons' knowledge and permission." Compl. ¶ 29, ECF No.1.

Defendants responded with a motion for judgment on the pleadings and for summary judgment.  ECF No. 15.  Defendants emphasize that S.'s decision to leave her parents' home was hers to make.  Defendants also emphasize that Plaintiffs do not make any allegation that Defendants coerced S. to leave her parents' home; an essential predicate for an allegation of a constitutional violation.

The papers submitted with Defendants' motion, and certainly Plaintiffs' response, significantly expand the description of the events beyond the allegations in the Plaintiffs' complaint.  S., as her mother described her during a state court proceeding, was "going through many teenage internal struggles." Although this Court is conscious of the private nature of those events, it is necessary to review some of those struggles because Plaintiffs' claims against Defendants cannot be disassociated from the larger context of those events. Defendants' motion will be addressed, but before doing so several additional points should be emphasized.

First, some brief attention needs to be given to Michigan law governing the obligation of parents to provide care and support to their children until the age of eighteen on the one hand, and yet, on the other hand, providing children the autonomous right to leave their parents' home at the age of seventeen.  *See* Mich. Comp. Laws §§ 712A.2(a)(2) & (3), 722.3, 722.151. Pursuant to Michigan Compiled Laws § 722.151, "[n]o person shall knowingly and wilfully [sic] aid or abet a child under the age of 17 years to violate an order of a juvenile court or knowingly and wilfully conceal or harbor juvenile runaways who have taken flight from the custody of the court, their parents or legal guardian."  Moreover, Michigan probate courts have jurisdiction to compel a juvenile who has deserted her home to return, at least until the juvenile reaches the age of seventeen.  Mich. Comp. Laws § 712A.2(a)(2) & (3).  On the other hand, although Michigan

law terminates the courts' jurisdiction over runaway children at seventeen, it also provides that parents still have an obligation to support their children until they reach the age of eighteen. Under Michigan Compiled Laws § 722.3, "parents are jointly and severally obligated to support" their minor children, and Michigan courts may order parents to continue to support their children after they reach the age of majority. In Michigan, the age of majority is eighteen. Mich. Comp. Laws § 722.52. Absent an adoption, a biological parent's obligation to support his or her children remains with the parent even if parental rights have been terminated. *See Evink v. Evink*, 542 N.W.2d 328, 329–30 (Mich. Ct. App. 1995). Whether these Michigan laws are well founded or not, they played a role in the events of this case.

Second, attention must be given to the standard of review that governs the "facts" that the court may consider in addressing Defendants' motion. As the Plaintiffs' emphasize, the Defendants have not been deposed about the Plaintiffs' allegations under oath. Similarly, of course, the Plaintiffs' daughter has not been questioned under oath about the events underlying this case. It is not unreasonable for one to ask, in light of the missing information, how can the events recorded here be labeled as "facts." The answer is explained more fully hereafter. But in brief, the "facts" the Court is to consider in connection with Defendants' motion are governed by the doctrine of qualified immunity and the standard of review.

Turning more directly to the task at hand, this case began with Plaintiffs Michael and Sandra Reardon's January 10, 2011, three-count complaint against Defendants Midland Community Schools, Laurie Stevens, and Kurt Faust. Plaintiffs contend that Stevens and Faust interfered with their First Amendment privacy right "to decide, free from unjustified governmental interference, matters concerning the growth, development[,] and upbringing of

their children." Compl. ¶ 35. Plaintiffs further contend that the Midland Community School District should be liable for the conduct of their employees because it inadequately trained them and failed to supervise them. *Id.* ¶¶ 40–49. Finally, Plaintiffs contend that Defendants are liable under Michigan law for the intentional infliction of emotional distress as a result of their "extreme and outrageous" conduct. *Id.* ¶ 51.

On April 25, 2011, Defendants filed a motion for judgment on the pleadings and for summary judgment. Defendants argue that Plaintiffs complaint does not state a claim upon which relief can be granted. Fed. R. Civ. P. 12(c). Defendants further argue that "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs initially responded with a request for discovery, contending that "facts essential to justify [their] opposition" were unavailable. Fed. R. Civ. P. 56(d). After considering Plaintiffs' response, the Court stayed discovery and directed a supplemental response on May 10, 2011, explaining that a motion for judgment on the pleadings tests the sufficiency of the pleadings themselves and not the underlying facts. ECF No. 19. The Court further emphasized that where qualified immunity is raised as a defense, the Court has an obligation to consider the defense before discovery. *See Saucier v. Katz*, 553 U.S. 194, 200 (2001). "Qualified immunity is an entitlement not to stand trial," the Supreme Court has established, "or face the other burdens of litigation." *Id*. On June 8, 2011, Plaintiffs filed their supplemental response, contending that their complaint sufficiently pleads a claim for interference with their constitutional right to parent and that Stevens and Faust are not entitled to qualified immunity. Defendants filed a reply on July 1, 2011.

For the reasons explained below, Defendants' motion will be granted and Plaintiffs' constitutional claims will be dismissed with prejudice.  Although Defendants also argue that the Court should dismiss the intentional infliction of emotional distress claim with prejudice, at this early stage of the case there is no justification for exercising supplemental jurisdiction over the state tort claim.  Accordingly, it will be dismissed without prejudice.  28 U.S.C. § 1367(c)(3).

## I.

Defendants' motion presents the Court with two different standards of review: the Rule 12(c) judgment on the pleadings standard and the Rule 56(a) summary judgment standard.  In considering a Rule 12(c) motion, the Court assumes all "well pleaded factual allegations" are true and will not look beyond the pleadings in reaching a conclusion.  *Lowden v. Cnty of Clare*, 709 F. Supp. 2d 540, 545 (E.D. Mich. 2010) (citing 5C Wright & Miller, Federal Practice & Procedure § 1368); *see also* Fed. R. Civ. P. 12(d) (directing the Court not to consider matters outside the pleadings).  In considering a Rule 56(a) motion, by contrast, the Court must review the entire record in the case and will consider affidavits, deposition transcripts, and other documents in reaching a conclusion.  Fed. R. Civ. P. 56(c).  Under Rule 56(a), the Court is obligated to construe facts in the Plaintiff's favor only if there is a genuine dispute as to what occurred, and there is no obligation to assume the well-pleaded allegations in Plaintiff's complaint are true.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  With those standards in mind, the pleadings, and any additional evidence, will be summarized.

**A.**

Plaintiffs are the parents of two daughters, including one, S., who was a junior at Dow High School in Midland, Michigan during the 2009–2010 school year.  That fall, when S. was sixteen years old, she began dating another student, Z.  Shortly after S. and Z. began dating, Plaintiffs began noticing a variety of changes in their daughter's attitude and behavior.  S., who had been a straight-A student, began receiving Ds and Es on tests and quizzes.  Plaintiffs believe she became combative, and believe they caught her lying to them about school projects and where she was going or had been on particular occasions.  Plaintiffs also observed S. staying up into the early hours of the morning, communicating with her friends, particularly Z., by phone, text message, and e-mail.

In an effort to address the problems they perceived with their daughter's behavior, Plaintiffs developed a series of new rules that Michael Reardon communicated to S. in an October 22, 2009 e-mail.[1]  ECF No.  23-2.  The rules required S. to complete her homework before engaging in social activities, like texting, which was limited to 105 minutes per night.  Plaintiffs established a curfew for S. of 9:30 p.m. on school nights, with texting permitted until 10:30 p.m.  Plaintiffs required S. to maintain a B average in her course work, limited her participation in extracurricular activities until she was able to demonstrate better time-management skills, and directed her to help with chores around the house.

By early January 2010, with S. still struggling at school and her parents still working to develop a strategy to address her behavior, Sandra Reardon spoke to S. about visiting a therapist.

---

[1]  Michael Reardon works in Wisconsin and spends weekdays there, necessitating electronic communications with his family during the week.

S. agreed to visit a therapist. Plaintiffs also agreed to participate in the therapy sessions as necessary.

During the first months of 2010, the intensity of S.'s texting continued, and Sandra Reardon began monitoring their frequency through the cell-phone provider's website and their content by occasionally looking at S.'s phone.   By monitoring the frequency of the text messages, Plaintiffs learned that S. often violated their no texting after 10:30 p.m. rule.   By monitoring the content of the messages, Plaintiffs learned that Z. was using sexually suggestive, aggressive, and disrespectful messages encouraging S. to escalate the physical nature of their relationship .  The next time Michael Reardon saw Z., he made a point to express his opinion that the messages were inappropriate.  ECF No. 23-3.  Z. agreed, and promised to stop sending such messages and encouraging S. to violate her parents' rules.  Z. indicated that his parents were also unhappy about his behavior.

Some time around March 19, 2010, S. and Z. engaged in sexual intercourse for the first time.  S. later informed her sister, and Plaintiffs also learned of their daughter's activities by monitoring her text messages.  When Sandra Reardon discovered a text message in April 2010, which confirmed that S. and Z. were sexually involved, she picked up the phone — at 11:15 p.m. on a Tuesday night — and attempted to call Z.'s parents, dialing the number of the only Reardon residence listed in the telephone book.  Instead of Z.'s parents, however, Sandra Reardon reached Z.'s grandmother, who was not pleased to receive a call about her grandson late at night.  The grandmother informed her caller that her grandson was "such a responsible boy who was going to be President."  ECF No. 23-6.  Sandra Reardon informed the grandmother of her grandson's sexual activity with her daughter and asked that she "have his mother call me."  *Id.*

Two days later, on April 22, 2010, Z.'s father, J., had a letter hand delivered to the Reardon's home, emphasizing his displeasure with Sandra Reardon's call to the grandmother. In the letter, J. criticized Sandra Reardon for calling the grandmother and referred to his son as a "wonderful" young man. ECF No. 23-5. He also suggested that S. and Z. should be left to make their own decisions and own mistakes, and that Plaintiffs' parenting style was too restrictive. J. wrote:

> These are high school kids who have to find their own way with the hopes that they stay safe and out of trouble and continue to be brought up in a healthy loving environment. These kids have great grades, study habits and work ethics. They are respectful and well liked by all. It doesn't get much better than that! They should be enjoying life, not under this type of emotional stress that is being placed on them. . . .

> Again, let's be clear, very clear. My son and this family will not tell you how to properly parent a nearly 17 year old. Your rules are your rules. [Z.] will respect you and so will this family. The same must hold true for you. Respect my son, respect this family, and do not speak derogatorily about [Z.] in any way or your misinformed view on his upbringing. There are to be no further calls to my mother's phone for any reason at any time. If you have something constructive to say, say it to me directly or put it in writing. If you would like to meet, let's set it up. I have no issue with that whatsoever. What is important to my son is important to me. As stated earlier, I have stayed out of this until now. You opened the door and I am now in.

> . . .

> These young people have a desire to see each other. That has been tested in the most severe of ways. Whisking [S.] off each weekend and not even allowing movie time and/or dinner has not stopped this relationship. Now I hear that you're not allowing her to go to the prom. It doesn't get more emotional, stressful or embarrassing than that. It should be a wonderful time with a new dress, a tux, dinner and a school function that has gone on for years and years. These kids should have a chance to enjoy their teenage years under normal guidelines and rules.

*Id.*

Michael Reardon responded, also by letter, on April 26, 2010. Michael Reardon complained about the "defamatory" accusations in J.'s letter, suggested that Z.'s conduct may be illegal, and emphasized how important children, and the responsibility of raising them, are to Plaintiffs. ECF No. 23-6. The letter also praised S., and lamented the changes in her behavior and conduct that appeared after she began dating Z. Michael Reardon explained some of the parenting choices Plaintiffs made with respect to S., and requested that J. and Z. stop meddling with those choices. He cited the cell phone Z. provided to S., and evidence that Z. and S. had helped coordinate the delivery of J.'s letter to the Reardon's home. Finally, the letter explained Sandra Reardon's decision to reach out to the Z.'s parents in a late night phone call, describing the text messages that prompted her concerns in detail. Michael Reardon wrote:

> What happened most recently has changed everything. After [Z.'s] acknowledgment and oath to respect my daughter and this family, the sexting messages from your son came to our attention again . . . with increased vulgarity and frequency. Within the reprehensible words of his texts to her was the revelation that your son was having "sexual intercourse" with our 16 year old daughter. Multiple times. We put that in quotes because that is not how he characterized his conduct. Rather, [Z.] bragged about "leaving his mark on her body" and said other demeaning (not loving) things about his encounters with a minor, including "I want to put my dick in you <u>again</u>, fondle your breasts and make marks all over your body." Further, "I miss having my dick in you and ur [sic] legs wrapped around me moaning and I want to kiss ur [sic] breasts and I want to give you more marks you can remember me by forever." If your son's sexting to and behavior with a minor does not concern you as a father, I would nonetheless expect that you would be concerned as [an attorney].

*Id.* (some quotation marks omitted, ellipsis in original). Michael Reardon's letter concluded by directing J. not to contact the Reardon family in the future, with the exception of providing information about any sexually transmitted diseases Z. might have, and emphasizing that "another letter, or otherwise further attempt to intimidate" the Reardons would result in notification of the state bar and J.'s employer. *Id.*

On May 8, 2010, S. turned seventeen, which means, as explained above, that her parents no longer have legal recourse to force her to remain in their home.  *See* Mich. Comp. Laws §§ 712A.2(a)(2) & (3), 722.151.  At 2:00 p.m. on May 7, the day before her birthday, she called her parents and informed them that she would not be returning home that evening.  Her mother called the police, who found S. and transported her to the police station where Sandra Reardon picked her up.  Upon returning home, S. informed her parents that she would be leaving home at midnight.  Her mother helped pack some clothes into a bag, and at midnight, S. walked out of her parents home, got into Z.'s waiting car, and drove away.  Other than court hearings, Michael Reardon has not seen his daughter since that day.  Sandra Reardon encountered S. once at S.'s workplace, where Sandra Reardon went to inform S. that her pet rabbit had died.

After leaving home on May 8, 2010, S. lived with Z.'s grandmother.  Later, she moved into an apartment that she shared with a group of Northwoods University students.  She continued attending classes and graduated from high school in May 2011.  She also found part-time employment as a waitress.  Plaintiffs continued to provide health insurance for S., but they did not assist her otherwise.

On January 18, 2011, S. filed a petition seeking emancipation from her parents in the Midland County Probate Court.  A guardian ad litem was appointed, and after preparing and filing his report, as Michigan law requires, the guardian filed two petitions seeking a minor guardianship and a minor conservatorship for S.  The court held a hearing on March 2, 2011, and after receiving testimony, concluded that the petition for emancipation should be dismissed, a guardian and conservator should be appointed for S., and the Plaintiffs should be required to

-10-

provide "reasonable support" for S. in accordance with Michigan law.  Mich. Comp. Laws. § 722.3(1).

## B.

Plaintiffs' complaint alleges that the Midland Community Schools, Stevens, and Faust played a substantial role in alienating them from their daughter.  The allegations contained in the complaint, which are presumed to be true for the purposes of Defendant's Rule 12(c) motion, are summarized below.

Michael and Sandra Reardon are the parents of two daughters, S. and A. Reardon. Compl. ¶¶ 5, 32.  S. was born on May 8, 1993, and was a student at Dow High School at the time the events underlying this case took place.  *Id.* ¶¶ 5–6.  In late 2009, S. began dating another student.  *Id.* ¶ 8.  The relationship rapidly grew serious and included frequent contact between S. and her boyfriend while they were at school and frequent contact by phone, e-mail, and text message while they were at home.  *Id.* ¶¶ 9–12.  On or about March 19, 2010, when S. was sixteen and living with her parents, she engaged in sexual intercourse with her boyfriend.  *Id.* ¶ 8. She also began exchanging sexually graphic text messages with him.  *Id.* ¶ 9.

Plaintiffs disapproved of S.'s relationship with her boyfriend and the choices the students made with respect to that relationship.  *Id.* ¶ 12.  As a result, the Plaintiffs

> (1) enrolled themselves and [S.] in family counseling; (2) monitored her cellular phone and email usage; (3) prohibited her from sending sexually suggestive messages or pictures to her boyfriend; (4) established [a] curfew; (5) conditioned her extracurricular activities on good performance at school; [and] (6) imposed rules governing her behavior at home, school[,] and with others.

*Id.* ¶ 13.  Plaintiffs also explained to Z. that they disapproved of the relationship and that they expected S. to abide by the rules they established.  *Id.* ¶ 14.

-11-

Despite the new rules and Plaintiffs' efforts to change S.'s behavior, the relationship between S. and her boyfriend continued and her relationship with Plaintiffs deteriorated. *Id.* ¶¶ 15–20. Plaintiffs believed that S.'s sexual relationship with her boyfriend was contrary to their religious beliefs and the "value system" they had worked to instill in their children. *Id.* Before S. began dating, Plaintiffs enjoyed a positive relationship with her and participated in church activities with her. *Id.* ¶ 11, 16.

Sometime after S.'s relationship with Plaintiffs deteriorated, S. complained to Stevens and Faust about the way she was being treated at home. *Id.* ¶¶ 21–24. S. told Stevens and Faust that she was being abused, and a complaint was made to Children's Protective Services. *Id.* Following an investigation, Protective Services did not discover any abuse. *Id.* Plaintiffs never abused S. *Id.*

Following S.'s complaints about her parents, Stevens and Faust engaged in activities that Plaintiffs allege "undermined [their] parental authority over S. and alienated S. from them." *Id.* ¶ 26. The activities Stevens is alleged to have engaged in included:

(a) on April 17, 2010, advising S. to develop an exit strategy, such as by slowly removing her things from her home, "a little at a time" and taking them to her boyfriend's home;

(b) on April 17, 2010, suggesting that S. apply for a Personal Protection Order against her parents;

(c) on April 17, 2010, suggesting that she obtain a legal foster relationship over S. so that she can "get money to help you;"

(d) on April 8, 2010, offering a foster parent relationship over S.;

(e) on April 8, 2010, advising S. to contact her through school email so that her mother "can't get that info;"

(f) on April 8, 2010, advising S. to consult with her boyfriend and his father [who is an attorney] about getting "help," when she knew or should have known that S.'s relationship with her boyfriend was a point of contention with S.'s parents;

(g) telling S. that she will obtain a phone for her that her mother could not access;

(h)     telling S. that "most parents of teens do not read their children's email, text messages, etc."

(i)      promising S. a place to live at her home where she will "have privacy. NO one is going to check your email, voicemail, text messages. I think you will find it much more relaxed than what you are used to."

(j)      supplying S. with money[.]

*Id.* ¶ 27.

The activities Faust is alleged to have engaged in included:

(a)     In response to [Plaintiffs'] concern about changes that S. made to her school schedule, privately telling S. that her mother was inquiring about her schedule;

(b)     purchasing contact lenses for S.;

(c)     excusing S.'s many absences from school;

(d)     setting himself up as the "facilitator" between S. and her parents so that S. could obtain things she needed from them without interacting with them;

(e)     whisking S. away from her mother at the National Honor Society Induction ceremony, to shield S. from her mother and prevent S. from having contact with her mother[;]

(f)     suggesting that S. stop seeing the counselor/therapist that had been working with her and [Plaintiffs], and providing "counseling" himself.

*Id.* ¶ 28.

On May 8, 2010, immediately after S. turned seventeen years old, she left her parents home and went to live with her boyfriend's grandmother. *Id.* ¶ 30–33. S. has had no contact with her parents since that date, except for "a phone call or two." *Id.*

## C.

The parties have also included additional factual information in the form of affidavits, transcripts of testimony given at other trials, and an assortment of documents. Although this material is "outside the pleadings" and may not be considered for the purposes of Defendants' Rule 12(c) motion, it may be considered for the purposes of Defendants' Rule 56(a) motion and will be summarized below.

S. met Stevens at a leadership camp sponsored by the school, and began working closely with her as a library assistant in September 2009. ECF No. 25. When Stevens met Sandra Reardon, S.'s mother, she praised S. and complemented Plaintiffs' parenting skills. *Id.* S. commented to her father, Michael Reardon, and her sister, A., about how "cool" Stevens was and about Stevens's "extremely permissive" parenting style. ECF Nos. 26, 27. After learning that S. had a close relationship with Stevens, Sandra Reardon e-mailed Stevens, noting that S.'s behavior had changed after she started dating, and hoping "Stevens would be of help to our family in dealing with [S.]" ECF No. 25. Stevens did not respond to Sandra Reardon's e-mail.

Plaintiffs also learned of Faust's relationship with their daughter for the first time in November 2009. Sometime that month, S. brought home a note from Faust inviting her to participate in a group discussion for students who were having trouble with their parents. *Id.* S. opted not to participate in the discussion because she was not having significant trouble getting along with her parents at that time. *Id.* Faust was not S.'s assigned guidance counselor. *Id.*

Sometime in March or April 2010, S. told Stevens about her parents' alleged abuse, including verbal abuse, pinching, and hair pulling, and indicated her intention to leave her parents' home. ECF Nos. 23-7, 15-2, 15-4. Stevens counseled S. concerning the consequences associated with leaving home, and urged her to wait until her seventeenth birthday, May 8, 2010. Although Stevens did not call Children's Protective Services regarding the alleged abuse, because she did not believe she was legally required to do so given the allegations, at some point Protective Services was called and an investigation was initiated. ECF No. 15-4. On April 8, 2010, Stevens followed up on their conversation with an e-mail.

[S.],

-14-

Just to let you know, I will be out of town until next Wednesday evening. However, if you decide to pursue the foster situation, Bruce and I are willing to pursue it with you. You would be able to live with us for a year until you go to college. I want you safe and I want you happy. Of course, it is not just that easy and there will [be] obstacles to overcome, but with the help of [J.] and others, we can help you. I think if you contact me through the school email, you are safe and mom can't get that info. Keep talking to [J.] and you need to talk to Kurt Faust. I love you . . Mrs. S

ECF No. 23-7. S. responded two hours later.

:) thank you so much Mrs Stevens i actually told [Z.] to do [sic] ahead with everything yesterday because i thought the sooner the better so someone from child services will contact me during school sometime today or tomorrow. They will decide at that point what to do with the whole situation. I'm a little scared and i will end up having to face my parents in court, but i think it will be worse to continue living in my house. I just want to let you know that you do not have to do this for me. I know i will be okay no matter what happens, but you were just the first person i thought to contact. Thank you for all of your support and please thank Mr. Stevens also.
I LOVE YOU TOO!!!! :)

*Id.*

On April 17, 2010, Stevens sent another e-mail to S. about the potential for Stevens and her husband to act as foster parents for S..

Hey [S.] . . . .

I am thinking of you. I am so worried about you. I just know you [sic] mom (and probably your dad) are just going to flip out. I just want you safe. So, a couple of things to think about . . .

1. My guess is that your parents will not let you take "your things" out of the house based on the premise that they have purchased you clothes, etc. My suggestion to you is that you start moving things out of the house, a little at a time, and put them at [Z.]'s house. Take what is important, leave the rest. They are just things. We can replace them.

2. We will move my craft and sewing stuff out of the small bedroom here. That room has a desk, dresser, and book shelf. You'll have to help me clean out the closet. We can take down the stuff on the walls and get a different bedspread if

-15-

you want.  This will be your home, and I want you to be comfortable, safe, and happy.

3.  The rules here will be very simple.  "Curfew" on weekdays by 9:00, weekends 12:30 (unless there is something special).  You have to pick up after yourself, do your own laundry, and your homework.  We don't have a car for you to take to school so I will drop you off and either pick you up or you can get a ride from one of your friends.  On weekends, if we aren't using our cars, you will have usage. You need to get a job.  Your friends will be welcome here.  And you will have privacy.  No one is going to check your email, voicemail, text messages.  I think you will find it much more relaxed than what you are used to.  The key here is adult support and safety.

4.  The reason for making sure we go through the courts is that you may need to file a PPO against your parents.  Also, if it is a legal foster situation, I think we would get money to help you.

5.  I do fear for your safety.  Please talk to [Z.]'s dad about this.  Make sure you have a leaving game plan in place.  I don't know how you just "walk out."  So, before you do just that, make sure you have your butt covered so you don't end up in lock up as a runaway.  Maybe (I don't know . . . I am just thinking here) [Z.]'s parents and Bruce and I and you should all sit down and figure this out.  If not, maybe you and I and Bruce should meet with officer Berchert (from DHS) and figure out.  The less drama involved is best for all of us, but especially you.

6.  Don't worry about "what after your senior year."  The future and how you will finance it, will fall into place.  We will help you figure it out.  Let's just get you safe.

S., let me assure you it is NOT ok for a parent to pinch and pull hair.  Most parents of teens do not read their children's email, text messages, etc, unless their child has given them a reason to do so.  We will get you a phone on which your mom can not have access.  When we travel this summer, we will make sure you have someone to stay with.  I am not worried about those things.  Just a job tip . . . The new Subway across from the McD's in Sanford is hiring.  You might check there.  And on that, I will stop rambling.  My mind is just racing today.  I will be at school on Tuesday morning for coffee.  What time can you be there?  Ok . . . enough for now.  Mrs. S

*Id.* (ellipses in original). S. responded, three days later on April 20, 2010.

Wow.  I don't know what to say.  All of this sounds so amazing and perfect.  I know everything is going to work out okay and that this will be better for me in the long run.  As for right now, the plans are not set in stone, but things are

developing as I figure out more about the process.  Thank you so much for this Mrs. Stevens I am so luck [sic] to have you and I hope to one day be as wonderful as you are.
:)

*Id.*

The next day, April 21, 2010, Stevens changed her mind about permitting S. to live at her home and becoming S.'s foster parent.  In an e-mail to another teacher, Stevens explained that Sandra Reardon had learned of the plan, "and she would probably make life really rough for me if I took in S., therefore, I [am] not willing to tangle with her."  *Id.*  She continued:

I have only seen S. maybe three times since I left Dow High and always at school when there were a zillion other students around.  I can also assure you that since Mrs. Reardon has chosen to be so "ugly" about this, that I will not be back at Dow High this year.  I have had very limited contact with any of the students since I left.  I am just too busy and I only respond when they have called me.  That is exactly what S. did.  She contacted me.

I can only hope that someone, somewhere, can help her.  These are the kinds of things we read about or hear about in the news and someone says, "why didn't someone do something[?]"  Stupid me for thinking that maybe we could slide underneath the radar if [S.] just showed up after she turned 17.  And shame on me for thinking I was going to help "save" this kid.  I feel for her.  I am concerned for her safety.  But after [Z.] sees her tomorrow, she will know that I am not an option for her. . . .

*Id.*

After Stevens rescinded her offer to take S. in as a foster daughter, she informed Faust by e-mail and by telephone that she was no longer able to take S.  *Id.*  Faust arranged a meeting for S. with "shelter house."  *Id.*

After S. left her parents' home on her seventeenth birthday, Faust continued to assist S. with managing the situation and fulfilling her needs.  First, S. and Faust arranged changes to S.'s class schedule to accommodate her work schedule, and when her parents inquired about the

schedule changes, Faust assured S. that he would "Stall like always :)[.]"   ECF No. 23-7. Plaintiffs were never consulted about the schedule changes, nor did they authorize the changes.

Faust also purchased contact lenses for S. and asked other teachers to contribute to the cost.  *Id.*  Faust made a similar request to other teachers to fund S.'s lunches, and ultimately secured free lunches for S.  *Id.*  When S. was ill, Faust e-mailed her teachers, explaining that she was "basically homeless" and asking that they excuse her absences.  *Id.*  In some of his e-mails, Faust made comments about keeping S.'s parents "off the scent" and asked other teachers to contact school administrators if Sandra Reardon came to the school.

## II.

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  The requirement is meant to provide the opposing party with " 'fair notice of what the . . . claim is and the grounds upon which it rests.' "  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 42, 47 (1957)).  If a complaint does not meet that standard, the opposing party may move to dismiss it for failure to state a claim at any time before filing an answer or for judgment on the pleadings after filing an answer.  Fed. R. Civ. P. 12(b)(6) & (c). "[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same." *Lowden*, 709 F. Supp. 2d at 545 (citing *Lindsay v. Yates*, 498 F.3d 434, 437 n.4 (6th Cir. 2007)).

"While a complaint attacked by a Rule [12(c) motion for judgment on the pleadings] does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (2007) (citations

omitted). "Factual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true . . . ." *Id.* at 555–56 (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570)). "Facial plausibility" requires the plaintiff to include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A motion for summary judgment, by contrast, should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). If the opposing party does not raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an

affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend 14.[2] The Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997)). The "interests of parents in the care, custody, and control of their children" is one of the "fundamental liberty interests" protected by the substantive component of the Due Process Clause. *Troxel*, 530 U.S. at 65. "Governmental actions that infringe a fundamental right receive strict scrutiny. Otherwise, they receive rational-basis review, which requires them only to be 'rationally related to a legitimate state interest.' " *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005) (quoting *Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir. 2000)).

Over the last ninety years, the Supreme Court has barred a number of state actions, concluding those actions interfere with a parent's fundamental right to make decisions about the

---

[2] Although Plaintiffs identify the First Amendment as the source of their constitutional interest in parenting, the case law makes plain that the Due Process Clause of the Fourteenth Amendment is the authority applicable to the issue developed in this case.

care, custody, and control of their children.  Thus, a state cannot interfere with a parent's decision to regulate the amount of time her child spends with his grandparents, absent some "special factors that might justify the [s]tate's interference." *Troxel*, 530 U.S. at 68.  A state cannot interfere with a parent's decision to send her child to a parochial school where the children are taught the German Language before eighth grade, *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), nor can a state require parents to choose public schools over private schools offering commensurate programs.  *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925).  Additionally, parents are entitled to make choices about their children's religious training and practices that the state may, as a matter of policy, disagree with.  *Wisconsin v. Yoder*, 406 U.S. 205, 219 (1972) (concluding Amish parents are entitled to choose a practical or technical education for their children following the eighth grade, as opposed to the formal academic education mandated by the state).  The parent's right to make such choices, however, is not absolute.  *See Prince v. Massachusetts*, 321 U.S. 158, 165–66 (1944) (concluding parent was not entitled to violate state law by permitting her child to distribute religious literature on public street).

More recently, the Supreme Court has affirmed that an unwed father has a right to the "companionship, care, custody, and management of his . . . children" and that the state may not interfere with that "absent a powerful countervailing interest." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).  *But see Quilloin v. Walcott*, 434 U.S. 246, 254 (1978) (concluding unwed father cannot veto the adoption of his child by the child's stepfather where the biological father made no effort to legitimize or care for the child in eleven years and the child lived with his mother the entire time).  The Court has also mandated that a state show abuse or neglect by clear and

convincing evidence before permanently terminating parental rights, *Santosky v. Kramer*, 455 U.S. 745, 761–62 (1982), and that an indigent parent whose rights have been terminated must be provided with an appeal that is not conditioned on payment of transcription costs and other fees, *M.L.B. v. S.L.J.*, 519 U.S. 102, 119–20 (1996). As the Court explained in *M.L.B.*, "[c]hoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *Id.* at 116 (citations and quotations omitted).

In this case, Plaintiffs contend that the counseling, advice, financial assistance, and companionship that Stevens and Faust provided to S. interfered with their constitutional right to control her upbringing. They further contend that the actions of Stevens and Faust were taken under color of state law. *See* 42 U.S.C. § 1983. In response, Defendants contend that Plaintiffs' complaint does not state a claim upon which relief can be granted. Fed. R. Civ. P. 12(c). Defendants further contend that even if Plaintiffs' complaint does state a claim for relief, because Stevens and Faust did not violate a clearly established constitutional right, they are entitled to qualified immunity. Fed. R. Civ. P. 56(a). Finally, Defendants contend that the *Monell* claim against the school district should be dismissed because there is no predicate liability of an individual Defendant. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

Defendants' first argument relates only to the sufficiency of the complaint. Although Defendants' questions about Plaintiffs' pleadings are legitimate, it is not necessary for the Court to address them. Rather, Defendants' motion for summary judgment will be granted because Defendants have demonstrated that there is no genuine issue of material fact as to whether

-22-

Plaintiffs' constitutional rights were violated.  Moreover, both Faust and Stevens are entitled to qualified immunity, and there is no evidence of an unconstitutional policy or custom by the school district.

## A.

The first issue is whether Plaintiffs can demonstrate that Stevens or Faust interfered with their constitutionally protected right to parent S.  Defendants contend that they cannot.  Every Supreme Court case discussing fundamental rights of parents with respect to their children address a state law or regulation that requires children to engage in an activity their parents do not want them to engage in, or prohibits children from engaging in an activity their parents do want them to engage in.  As the Sixth Circuit explained in *Doe v. Irwin*,

> In each of the Supreme Court cases the state was either requiring or prohibiting some activity.  In *Meyer v. Nebraska*, [262 U.S. 390,] the state forbade the teaching of foreign languages to pupils who had not passed the eighth grade.  The Court held the statute not reasonably related to any end within the competency of the state and violative of parents' Fourteenth Amendment right to liberty.  *In Pierce v. Society of Sisters*, [268 U.S. 510,] the statute required all children between the ages of 8 and 16 to attend public schools.  The Court found that the law unreasonably interfered with the liberty interest of parents to direct the upbringing and education of their children, including the right to send them to accredited private schools.  Again in *Wisconsin v. Yoder*, [406 U.S. 205,] the law in question made school attendance compulsory.  The Court held that Amish parents' First Amendment rights to the free exercise of their religion were infringed by the attendance requirement.  In *Prince v. Massachusetts*, [321 U.S. 158,] child labor laws were construed to prohibit street sales of religious tracts by children.  In that case the Court upheld the conviction of a parent who contended that these laws unreasonably interfered with her right of free exercise of religion and her parental rights.  In so holding, the Court determined that a state's "authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience."

615 F.2d 1162, 1168 (6th Cir. 1980) (citation omitted).  As in *Irwin*, the "State of Michigan . . .

has imposed no compulsory requirements or prohibitions which affect rights of the plaintiffs."

*Id.*

Still, as Plaintiffs emphasize in their response, this case is distinguishable from *Irwin*.  In

*Irwin*, a group of parents sought an injunction preventing a state-run family planning clinic from

distributing contraceptives to minors without the consent of their parents.  *Id.* at 1163.  The

parents argued that the clinic's activities violated their rights as parents because the clinic

systematically excluded the parents from important decisions in their children's lives, including

whether to use contraceptives, and by implication, whether to engage in sexual intercourse.

Although there was expert testimony presented that the clinic's activities "undermined . . . family

stability and trust among family members," *id.* at 1164–65, the Sixth Circuit concluded that the

activities did not interfere with the parents' constitutional rights to the custody and control of

their children.  *Id.* at 1168–69.  The Sixth Circuit emphasized that the Constitution does not

impose an affirmative duty on family planning clinics to notify parents before they supply

contraceptives to their minor children.  *Id.* at 1168.

By contrast, Plaintiffs in this case do not seek to impose an affirmative duty on schools or

teachers.  Rather, they assert that teachers are prohibited from interfering in a decision that they

contend is exclusively within the province of the family.  Plaintiffs contend this case most

closely resembles *Arnold v. Board of Education of Escambia County Alabama*, where the

Eleventh Circuit concluded that school officials violated the plaintiffs' fundamental interest in

parenting by encouraging the plaintiffs' children to seek abortions.  880 F.2d 305 (11th Cir.

1989), *abrogated in part by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

In *Arnold*, a minor male and a minor female who had conceived a child together sued, along with their parents, the school district where they attended classes, alleging that school officials had "coerced" the minor female into aborting the child and the minor male into assisting her. The school officials also coerced the children to conceal the pregnancy and abortion from their parents, and hired them for menial jobs so that they could raise the funds to pay for it. Among several claims against the school system, the plaintiffs argued that coercing the minors into seeking an abortion and concealing it from their parents violated the parents' due process right to make decisions concerning the growth, development, and upbringing of their children. *Arnold*, 880 F.2d at 312–13. The district court granted the school system's Rule 12(b)(6) motion to dismiss the claim, but the Eleventh Circuit reversed, concluding that the alleged coercion stated a claim for relief under 42 U.S.C. § 1983 and the Fourteenth Amendment. *Id.* at 312. After summarizing the same Supreme Court decisions discussed earlier in this opinion, the court noted:

> These cases demonstrate a willingness to protect from unjustified state interference the parental right to structure the education and religious beliefs of one's children. Likewise, in this case we encounter a state intrusion on this parental right. Coercing a minor to obtain an abortion or to assist in procuring an abortion and to refrain from discussing the matter with the parents unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child. This deprives the parents of the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children.

*Id.* at 313.

But the court also cautioned that the parents' right to influence their children's religious and moral beliefs, and to direct their upbringing, is not absolute. *Id.* Indeed, the court identified counseling as a specific activity that school officials are entitled to engage in without offending the Fourteenth Amendment. *Id.* at 314. The court acknowledged that while counseling "intrudes somewhat" on parental rights, guidance counselors play "an important role . . . as trusted confidant of many students. Counselors possess [F]irst [A]mendment rights to free speech and we do not seek to curtail the beneficial use of counseling." *Id.* Nor did the court hold that counselors are required to inform a child's parents when the child seeks counseling. Rather, the court's conclusion was limited to situations were school officials exerted coercive pressure on a child to seek an invasive and controversial medical procedure, and to conceal that procedure and the condition that led to it from the child's parents. *Id.*

This case is distinguishable from *Arnold*. First, there is no evidence that Faust, Stevens, or anyone else employed by the Midland Community Schools exerted coercive pressure on S. to leave her parents home. Rather, S. approached Stevens and Faust to discuss the problems she perceived that she was having with her parents and indicated her desire to leave home. Stevens and Faust then suggested alternatives and offered to support her decision if she chose to leave her parents home, but there is no suggestion that they coerced her to leave her parents' home.

Moreover, in *Arnold* the Eleventh Circuit was examining only the sufficiency of the complaint, whereas here, the parties have requested that the Court to inquire into information that is outside the pleadings.[3] That information reasonably leads to the conclusion that Faust and

---

[3] Additionally, the *Arnold* decision was issued long before the Supreme Court decided *Iqbal*, 129 S. Ct. 1937, or *Twombly*, 550 U.S. 544, which made clear that a complaint must include enough factual information to raise a right to relief above a speculative level. If *Arnold* were decided today, the mere allegation that school

Stevens undertook the actions they did to help S. address a challenging situation by providing guidance and support. S. may well have overreacted to her parents rules, rules that may well have been reasonable, but when S. turned to Faust and Stevens, neither was constitutionally obligated to meet S.'s request for assistance with silence or a cold shoulder. Nothing in the Constitution prohibits school teachers or counselors from counseling students, nor does it require that the teachers and counselors obtain parental consent about the character of their counseling in the context of the facts alleged in this instance.

Notably, *Arnold* arose in Alabama and was decided by the Eleventh Circuit Court of Appeals. As such, it is not governing legal authority for this Court. On the contrary, this Court is obligated to be conscious of the limitations on the substantive due process rights of parents that were established by the Sixth Circuit in *Irwin*, and the extent to which those limitations may conflict with *Arnold*. 615 F.2d 1162. Under *Irwin*, a state may not affirmatively interfere with a parent's right to direct the upbringing of that parent's child, but the Fourteenth Amendment also does not "nullif[y]" a state's authority to provide for the education and care of the children living in that state. *Id.* at 1168 (quoting *Yoder*, 321 U.S. at 166). The due process rights of the parents must be balanced against the State's substantial interest in the welfare of children. In this case, Plaintiffs cannot demonstrate that the actions of Stevens and Faust tipped that balance too far in favor of the State and against the parents.

In conclusion, Plaintiff's complaint and the evidence in the record demonstrate that after S. came to Stevens and Faust for assistance, Stevens and Faust "advised" S., "suggested" various solutions to the problems she presented, offered financial assistance, and provided counseling to

---

officials "coerced" the minors into obtaining an abortion, without any supporting factual information, may not meet with the pleading requirements set forth by the Supreme Court in *Iqbal* and *Twombly*.

-27-

help S. address the problems she perceived with her parents.  Their conduct did not violate Plaintiffs' due process rights and Plaintiffs' constitutional claims, against all Defendants, will be dismissed with prejudice.[4]

## B.

Even if Plaintiffs could demonstrate a violation of their constitutional right to parent, their claims against Stevens and Faust would still be dismissed because both individual Defendants are entitled to qualified immunity.  "Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity is immunity from suit, not merely a defense to liability.  *See id.* at 200–01. Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity.  *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001).

Generally, summary judgment based on qualified immunity is proper if the law did not put the actor on notice that her conduct would be clearly unlawful.  *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002).  However, if genuine issues of material fact exist as to whether the

---

[4] Plaintiffs' claims against the school district itself are also subject to dismissal under the rules governing municipal liability set forth by the Supreme Court in *Monell*.  436 U.S. 658.  Because Plaintiffs do not allege a viable constitutional violation by Defendant Stevens or Faust, they have also not alleged an unconstitutional policy or custom leading to the alleged constitutional violation, nor have they offered any evidence that a failure to train or supervise Stevens and Faust caused the alleged violation.

actor committed acts that would violate a clearly established right, then summary judgment is improper. *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988).

Whether a defendant is entitled to qualified immunity depends on a two-step inquiry: first, whether the violation of a constitutional right has occurred, and second, whether the right at issue "was clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citations and quotation marks omitted). As already explained, Plaintiffs cannot demonstrate that Defendants violated their constitutional rights. Moreover, even if there was some unconstitutional interference, the wrongfulness of Defendants' conduct is not clearly established.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted); *see also Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). "This standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful." *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997) (quotations marks and citation omitted, alteration in original).

Generally, there are two ways in which a plaintiff may show that government officials "were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care . . . the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, the violation may be shown "by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s]' the case." *Id.* (quoting *Brousseau*, 543 U.S. at 201)."For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstance." *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997).

Here, Plaintiffs cannot demonstrate the right was clearly established by either of the methods described in *Lyons*. First, as already explained, the alleged "violation" was not "obvious under the general standards of constitutional care." *Lyons*, 417 F.3d at 579 (quotations and citations omitted). Courts have generally found a parent's constitutional right to direct the upbringing of a child violated only where the state has "either requir[ed] or prohibit[ed] some activity." *Irwin*, 615 F.2d at 1168 (citing *Meyer*, 262 U.S. 390). In this case, the state has not prohibited nor required anything. Moreover, Plaintiffs have not identified any authority from the Sixth Circuit or the Supreme Court where an affirmative duty has been imposed on state officials to do, or refrain from doing, some activity based on the substantive due process rights of parents. *See id.* (declining to impose an affirmative duty on a state-run birth control clinic to notify parents if their children seek care). Accordingly, the alleged violation is not "sufficiently

obvious" that Defendants Stevens and Faust should have known that their conduct violated the general requirements of constitutional care. *Id.*

Second, Plaintiffs have not identified a particularized body of precedent that squarely governs this case. *Lyons*, 417 F.3d at 579 (quotations and citation omitted). As already discussed, the nearest Plaintiffs come to identifying a particular case is the *Arnold* decision from the Eleventh Circuit. 880 F.2d 305. *Arnold*, however, does not squarely govern this case, because there is no evidence of coercion. Moreover, Defendant has not cited a decision from the Sixth Circuit or the Eastern District of Michigan that follows *Arnold*'s reasoning. In *Arnold*, the school officials had both coerced the students to make controversial decisions and coerced the students to keep those decisions private from their parents. Here, there was no suggestion of any similar coercion. S. sought help from the school officials, and S., elected to hide the decision from Plaintiffs. Defendants' decision to respect S.'s wishes by not disclosing her actions to her parents does not violate a clearly established constitutional right. Defendants' had no affirmative duty to tell S.'s parents about her concerns or the fact that she was considering leaving home. *Irwin*, 615 F.2d at 1167–68.

Accordingly, even if Plaintiffs could demonstrate a violation of their constitutional rights, their claims against Stevens and Faust would still be dismissed because both individual Defendants are entitled to qualified immunity.

## C.

The final issue that must be addressed is whether it is premature for the Court to grant Defendants' motion for summary judgment. Pursuant to Rule 56(d), if Plaintiffs can demonstrate "by affidavit or declaration that, for specified reasons, [they] cannot present facts

essential to justify [their] opposition, the court may" defer consideration of the motion, deny it, or enter some other appropriate order.  Fed. R. Civ. P. 56(d).  As Plaintiffs emphasize—particularly in their first response to Defendants' motion (ECF No. 18) — " 'summary judgment is improper if the non-movant is not afforded sufficient opportunity for discovery.' " *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002) (quoting *Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996)) (additional citations omitted).  But it is the non-movant, in this case the Plaintiffs, who bear the "obligation to inform the district court of [their] need for discovery." *Id.*

In a Rule 56(d) affidavit attached to their initial response to Defendants' motion, Plaintiffs' attorney suggests that additional discovery is needed to respond appropriately to the motion for summary judgment.  ECF No. 18-3.  Specifically, Plaintiffs contend that it is necessary to depose Stevens, Faust, S., and potentially other witnesses, and that a forensic examination for the school district's computer system may be necessary to ensure that all of the relevant e-mail messages have been disclosed.  Plaintiffs contend that they have not had an opportunity to inquire into S.'s face-to-face communications with Stevens or Faust.

The affidavit is insufficient to demonstrate that additional discovery is necessary before the motion for summary judgment is resolved.  First, while Plaintiffs suggest that "flushing out" S.'s verbal communications with Faust and Stevens is necessary, they do not provide any reason for believing that doing so will reveal the type of coercive conduct that is necessary to establish a constitutional violation.  Moreover, even if depositions revealed additional evidence, Plaintiffs are still required to demonstrate that the constitutional right at issue is clearly established to overcome qualified immunity.  Plaintiffs have not identified the "essential" facts they believe

that the depositions would likely reveal, or how those facts would support their constitutional claims. Fed. R. Civ. P. 56(d); *see also Singleton v. United States*, 277 F.3d 864, 872 (6th Cir. 2002) ("[A] district court need not allow additional discovery by the nonmoving party if the party does not explain how such discovery would rebut the movant's showing of the absence of a genuine issue of material fact.") (citations omitted)).

Importantly, Defendants Faust and Stevens have demonstrated that they are entitled to qualified immunity, an issue that the Supreme Court has insisted on resolving early in the case. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasizing that "insubstantial claims" must be resolved on qualified immunity grounds before discovery). Plaintiffs have not demonstrated through their Rule 56(d) affidavit that additional discovery would lead to a different conclusion. Accordingly, it is appropriate to grant summary judgment in favor of Defendants at this time.

**IV.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 15) is **GRANTED**.

It is further **ORDERED** that Plaintiffs' constitutional claims are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiffs' state-law claims are **DISMISSED WITHOUT PREJUDICE** based on the Court's conclusion that it is inappropriate to exercise supplemental jurisdiction over those claims in a situation where all of the federal claims were dismissed early in the case and long before trial.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 2, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 2, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS